IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **SHANTE STEPHENSON** <br> 1722 Monterey Court <br> Cincinnati, OH  45231 <br><br> Plaintiff, <br><br> -vs- <br><br> **CAITO FOODS, LLC, a Michigan limited liability company,** <br> **SERVE:**  CSC-Lawyers Incorporating Service <br> 50 West Broad Street, Suite 1330 <br> Columbus, OH  43215 <br><br> Defendant. | Civ. No. <br><br> JUDGE: <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

COMES NOW the Plaintiff, Shante Stephenson (hereinafter "Plaintiff"), by and through her attorneys of record, asserting claims against Caito Foods, LLC, a division of SpartanNash Company (hereinafter "Caito"), and alleging as follows:

## NATURE OF THE ACTION

1. The present case arises out of a large multistate outbreak of *Salmonella* Carrau caused by pre-cut fresh fruit produced by Defendant Caito.

2. In March of 2019, Plaintiff Shante Stephenson purchased pre-cut fruit at the Kroger store located at 7132 Hamilton Avenue in Cincinnati, Ohio.

3. The pre-cut melons were produced by Defendant Caito at its facility in Indianapolis, Indiana—the same facility responsible for producing the tainted contaminated cut-fruit products responsible for a separate large outbreak of *Salmonella* poisonings just a year earlier.

1

4. The fruit purchased and later consumed by Plaintiff Shante Stephenson was contaminated with the *Salmonella* bacteria.

5. As a result of consuming the contaminated fruit product, Ms. Stephenson developed a severe *Salmonella* infection that (among other dreadful outcomes) colonized her ovaries, leading eventually to a hospitalization and emergency removal of her left ovary and fallopian tube.

6. Although this surgery may have saved her life, it also likely left Ms. Stephenson—childless and just 26 years old—unable ever to conceive a child of her own.

## **THE PARTIES**

7. Plaintiff Shante Stephenson is a resident of Ohio.

8. Defendant Caito is a Michigan limited liability company.

9. Upon information and belief, the sole member of Caito is SpartanNash Company, a Michigan corporation with its principal place of business in Grand Rapids, Michigan.

10. Accordingly, Caito is a resident of Michigan for the purposes of diversity jurisdiction.

11. Defendant Caito is in the business of producing, processing and distributing fresh fruit and vegetable products throughout the country, including into the State of Ohio.

12. Its corporate parent SpartanNash Company is a Fortune 400 company and fifth largest food distributor in the United States. SpartanNash Company recorded 2019 net sales of over $8.54 billion dollars.

**JURISDICTION AND VENUE**

13. Subject matter jurisdiction in this matter is proper because the amount in controversy, exclusive of interest and costs, exceeds Seventy-five Thousand Dollars ($75,000.00) and the parties are citizens of different states, both as required by 28 U.S.C. § 1332(a).

14. Venue of this matter is proper in the United States District Court for the Southern District of Ohio, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim set forth herein occurred in this judicial district.

**FACTUAL ALLEGATIONS**
*Salmonella* **and Food Safety**

15. *Salmonella* is a bacterium that occurs in humans and other animals and is shed in their feces.

16. When *Salmonella* is ingested by humans it can cause severe gastroenteritis called salmonellosis. Symptoms of salmonellosis include nausea, vomiting, diarrhea, and abdominal pain. Headache, myalgia, and low-grade fever may also accompany salmonellosis.

17. Symptoms typically develop within 6 to 72 hours after ingesting contaminated food or water. Symptoms usually last for several days but severe cases can last much longer and result in serious medical complications.

18. Long-term health issues in individuals who suffer from salmonellosis are well documented and include reactive arthritis, inflammatory bowel syndrome, and immunological deficiencies.

19. In partnership with state health departments, the Centers for Disease Control ("CDC") actively monitors *Salmonella* cases throughout the country to identify outbreaks. Using sophisticated genetic typing technology known as Pulse Field Gel Electrophoresis

(PFGE) and Whole Genome Sequencing (WGS), the CDC can detect when multiple Salmonella infections are caused by a genetically related strain of the bacteria. Public health investigators then use this data and interviews to pinpoint the source of a particular outbreak.

20. Because of the well-known risks to human health posed by the *Salmonella* bacteria, responsible food manufacturers take steps to prevent contamination of their food products and processing environments and to actively monitor the safety of their products.

21. Fresh-cut fruit—any fruit that has been physically altered from its original form but remains in its fresh state—presents a particular risk of microbial growth when inappropriately processed, packaged, stored or handled. Therefore, producers and sellers of fresh-cut fruit must address food safety at every step of production, from field to fork.

22. In fact, as early as 2008, the Food and Drug Administration published a guidance document to industry entitled "Guidance for Industry: Guide to Minimize Microbial Food Safety Hazards of Fresh-cut Fruits and Vegetables."

23. The guidance document, now more than a decade old, spells out the risks of fresh-cut products and the responsibility of food manufacturers to maintain strict sanitation practices:

> Processing fresh produce into fresh-cut products increases the risk of bacterial growth and contamination by breaking the natural exterior barrier of the produce. The release of plant cellular fluids when produce is chopped or shredded provides a nutritive medium in which pathogens, if present, can survive or grow. Thus, if pathogens are present when the surface integrity of the fruit or vegetable is broken, pathogen growth can occur and contamination may spread. The processing of fresh produce without proper sanitation procedures in the processing environment increases the potential for contamination by pathogens (see Appendix B, "Foodborne Pathogens Associated with Fresh Fruits and Vegetables."). In addition, the degree of handling and product mixing common to many fresh-cut processing operations can provide opportunities for

contamination and for spreading contamination through a large volume of product. The potential for pathogens to survive or grow is increased by the high moisture and nutrient content of fresh-cut fruits and vegetables, the absence of a lethal process (e.g., heat) during production to eliminate pathogens, and the potential for temperature abuse during processing, storage, transport, and retail display. Importantly, however, fresh-cut produce processing has the capability to reduce the risk of contamination by placing the preparation of fresh-cut produce in a controlled, sanitary facility.

## Caito Promises Safe Food

24. Caito Foods promised its retail customers and consumers that its fresh-cut products were safe.

25. For example, its website as of March 31, 2019, promised that Caito Foods would "go above and beyond to follow and exceed industry regulations." Available at http://www.caitofoods.com/about/mission-and-values (March 31, 2019).

26. In describing its commitment to food safety, Caito Foods published the following description of its "Dedication to Food Safety":

> **Food safety is part of everything we do at Caito Foods. All of our facilities are Safe Quality Foods (SQF) or BRC certified.\* We understand food safety is critical to our customers' success, and as a result, our success.**
>
> Our SQF system includes risk management and preventative systems including a food safety HACCP plan. The Hazard Analysis and Critical Control Point (HACCP) system is a management system focused on prevention of problems in order to assure the production and storage of food products are safe to consume. It is based on a common-sense application of technical and scientific principles to the food production process from production/harvest to consumption. The principles of HACCP are applicable to all phases of food production, including basic agriculture, food preparation and handling, food processing, distribution, food service, retail, and consumer handling and use.

5

> The entire Caito Foods team works together daily to ensure all food safety policies are consistently followed. Our emphasis on food safety is woven throughout the process of growing, transporting, handling, storing and repacking, and delivery to your store shelves for your customers to purchase with confidence.
>
> \* A globally recognized certification based on verification and validation of procedures, systems and processes.

Available at http://www.caitofoods.com/about/mission-and-values/food-safety

### Caito's Repeated Failures to Live Up to its Food Safety Promises

27. Despite these promises and despite the known risks of selling fresh-cut fruit, Caito repeatedly allowed unsafe, contaminated food to be produced at and distributed from its Indianapolis Fresh Cut facility.

28. In 2016, for example, a Caito foods product tested positive for the deadly pathogen *Listeria monocytogenes*.

29. This product positive spurred an FDA inspection which resulted in the issuance of an FDA "Form 483."

30. FDA issues Form 483s following the observation of specific and significant violations of the Food Drug and Cosmetic Act.

31. The findings in 2016 included the following:

- The plant is not constructed in such a manner as to prevent drip and condensate from contaminating food.
- Failure to clean and sanitize food contact surfaces in wet-processing before use, to preclude contamination with microorganisms.
- All reasonable precautions are not taken to ensure that production procedures do not contribute contamination from any source.

32. In addition to those formal findings, FDA noted that there were issues with Caito's recordkeeping and its verification of sanitizer concentration.

6

33. Despite this formal censure, Caito continued to ship contaminated food out of its Fresh Cut facility in Indianapolis, leading to two separate large outbreaks of *Salmonella* poisonings that sickened hundreds.

34. First, in April and May of 2018, the CDC detected a spike in illnesses caused by the relatively rare *Salmonella* serotype called "Adelaide."

35. The early *Salmonella* Adelaide isolates obtained by health departments in 2018 proved to be PFGE and WGS matches, a clear indication of a multi-state, single-source foodborne illness outbreak. The CDC and state health departments launched a full-fledged epidemiological and microbiological investigation.

36. By June 7, 2018, CDC had identified 60 people in five states who all contracted the outbreak strain of *Salmonella* Adelaide. As part of the investigation, ill individuals were extensively interviewed, and a striking pattern emerged: most reported consuming pre-cut melon in the week before illness onset. Further investigation revealed that Caito Foods had supplied the pre-cut product to the stores where ill individuals shopped.

37. In addition to the overwhelming epidemiological evidence linking the outbreak to Caito Foods, the Michigan Department of Agriculture found *Salmonella* Adelaide after testing samples of cut cantaloupe and watermelon produced by Caito. With this product positive, the evidence that Caito had caused the outbreak was overwhelming.

38. On June 9, 2018, Caito announced a recall of its fresh cut cantaloupe, honeydew melon, watermelon and other fresh-cut products.

39. In total, CDC concluded that 77 people in nine states contracted *Salmonella* from Caito Foods melon produced at the Indianapolis facility.

40. In response to the epidemiological and microbiological evidence accumulated by CDC and state health departments, the FDA conducted another inspection of the Caito production facility in Indianapolis.

41. The "Establishment Inspection Report" noted several critical deficiencies, including:

- The plant was not designed to facilitate maintenance and sanitary operations. There was condensation from the cooling units and on electric cords located directly above the pineapple line, where fresh, ready-to-eat pineapples were being peeled and cut.
- The firm did not conduct operations under conditions and controls necessary to minimize the potential for contamination of food. Five employees were observed neglecting appropriate personal sanitizing procedures when entering the production area.
- The firm did not take a reasonable measure and precaution related to personnel practices. Employees were seen handling containers and packing materials and then returning to cut watermelon without first cleaning and sanitizing their hands.
- The cooling units' fans appeared to be dirty.
- The firm used a lower concentration of sanitizing chemical than called for on the package label.

**2019 Outbreak of *Salmonella* Carrau and Closure of Facility**

42. After the 2016 violations and the 2018 *Salmonella* outbreak, Defendant knew that its Indianapolis facility was susceptible to widespread pathogenic contamination.

43. Yet even after sickening dozens with salmonellosis and being alerted to numerous deficiencies in its operations, Caito continued to produce fresh-cut fruit using the same extremely dangerous plant and process.

44. As a result, just months after the 2018 *Salmonella* outbreak ended, Caito caused yet another one.

45. In late March and April of 2019, the CDC identified multiple individuals sickened by a rare *Salmonella* serotype known as Carrau.

46. PFGE and WGS analysis of samples obtained from ill individuals confirmed that they were sickened by a genetically distinct strain of *Salmonella* Carrau, indicating a common source of the illnesses.

47. Epidemiologic and traceback evidence collected by public health investigators indicated that pre-cut melon supplied by Defendant Caito Foods from its Fresh Cut manufacturing operation in Indianapolis was the source of the illnesses.

48. As of June 8, 2019, the CDC reported that 137 people in ten mostly midwestern states had contracted Salmonella from the outbreak strain and 38 of those people required hospitalization. The reported illnesses occurred within the period of March 3 to May 1, 2019.

49. Faced with this evidence, Defendant Caito initiated a recall of pre-cut watermelon, honeydew melon, cantaloupe, and pre-cut fruit medley products containing any of these melons produced at the Caito Foods LLC Fresh Cut manufacturing operation in Indianapolis, Indiana.

50. The recalled products were distributed to Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, New York, North Carolina, Ohio, Pennsylvania, Tennessee, West Virginia, and Wisconsin.

51. The recalled products were sold in clear, plastic clamshell containers at several retail stores, including Kroger stores in Cincinnati.

52. After the 2016 FDA violations, the 2018 *Salmonella* outbreak, and the 2019 *Salmonella* outbreak, the Fresh Cut manufacturing operation in Indianapolis was finally shut down in approximately April of 2020, leading to the termination of 333 Caito employees.

53. The cause Caito cited for the closure of the Indianapolis facility was the "unforeseen cancellation of a customer contract that makes up the majority of [Caito's] Fresh Cut business."

54. Upon information and belief, the customer contract in question was with Kroger Company, the owner of the store where Plaintiff Stephenson bought the fruit that sickened her.

### Shante Stephenson's *Salmonella* Infection

55. In March of 2019, Plaintiff purchased a pre-cut fruit tray from the Kroger store located at 7132 Hamilton Avenue in Cincinnati, Ohio.

56. The pre-cut fruit tray purchased by Plaintiff contained contaminated fruit produced by Defendant Caito.

57. After consuming the pre-cut fruit manufactured by Caito, Ms. Stephenson began feeling sick. At first, the symptoms presented generally: malaise, a headache, joint pain, and a stomachache.

58. The next day, Ms. Stephenson went to the emergency department at Good Samaritan hospital. She was not tested for *Salmonella* and instead was prescribed a course of an antibiotic, Flagyl, as well as Tramadol for pain.

59. By April 11, 2019, Ms. Stephenson began having fevers and felt so cold and was so weak she could barely stand.

60. Given her worsening condition, Ms. Stephenson went to Mercy West Hospital's emergency room for further treatment of presumed endometritis and sepsis.

61. On April 12, Ms. Stephenson continued to have a fever over 100 degrees despite IV antibiotics. An ultrasound of Ms. Stephenson's abdomen showed that her pre-existing ovarian cyst, which was just being monitored previously, had grown in size.

62. By the third day in the hospital, Ms. Stephenson's temperature remained under 100 degrees. After three harrowing nights in the hospital, Ms. Stephenson was finally discharged on April 14, 2019.

63. After returning home and finishing her course of antibiotics, Ms. Stephenson failed to improve. Frustrated with the poor care she had received at the previous two hospitals, Ms. Stephenson went to a third hospital—The Christ Hospital in Cincinnati.

64. Upon arrival at triage at 1:47 a.m. on April 30, 2019, Ms. Stephenson reported abdominal pain, chest pain, and a headache, telling the nurse that she had recently been admitted at Mercy Hospital for a suspected ovarian cyst and abdominal pain.

65. Upon comparison to the prior imaging, the physician suspected that the cyst had possibly hemorrhaged. Dr. Bryan consulted Dr. Harley Grimm, an OB-GYN, who recommended that she have another pelvic ultrasound done to further evaluate the ovary.

66. The ultrasound imaging appeared consistent with a hemorrhagic ovarian cyst—the mass had grown 2.6 centimeters since her admission at Mercy Hospital.

67. Following the ultrasound and fluids, Ms. Stephenson was discharged from the hospital with a prescription opioid painkiller and anti-nausea medication for close follow up by Dr. Grimm.

68. Ms. Stephenson's pain did not abate, so on May 6, 2019, the 27-year-old went under general anesthesia for what she believed would be an exploratory laparoscopy with the potential that she would need the cyst or, worst case scenario, the left ovary removed.

69. Instead, copious amounts of purulent fluid began draining from Ms. Stephenson's left ovary. Based on this, it was clear that the ovary and left fallopian tube would need to be emergently removed.

70. Even after removal of the left ovary and fallopian tube, her other ovary and fallopian tube remain riddled with scar-like adhesions, leaving her unlikely to be able to conceive a child.

71. Finally, on May 9, 2019, Ms. Stephenson was discharged from the hospital to continue recovering at home.

72. Cultures obtained from the fluid in Ms. Stephenson abdomen were positive for the outbreak strain of *Salmonella* Carrau, and both the CDC and Ohio Department of Public Health concluded that her infection was caused by consuming Caito Foods fresh-cut fruit.

## COUNT I
### Strict Products Liability
### Defective Manufacture – Caito
### Ohio Rev. Code Ann. §§ 2307.74, 2307.78

73. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and alleges as follows:

74. At all relevant times to this action, Defendant Caito was a manufacturer and distributor, as defined in Ohio Revised Code § 2307.71 *et seq.*

75. Defendant Caito designed, manufactured, supplied, marketed, and sold contaminated pre-cut fruit product consumed by Plaintiff Shante Stephenson.

76. The pre-cut fruit was expected to and did reach the ultimate consumers, including Plaintiff Shante Stephenson, without substantial change in the condition in which it was sold.

77. Plaintiff Shante Stephenson could not, through the exercise of reasonable care, have discovered the defects or perceived the danger posed by the pre-cut fruit product.

78. When the pre-cut fruit product left the place of manufacture, it was defective as it contained the pathogenic *Salmonella* bacteria. This adulteration represents a material deviation from the design specifications, formula, or performance standards of Caito, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards.

79. The defects in Defendant Caito's fresh-cut fruit, consisting of, but not limited to, adulteration with *Salmonella*, were a direct and proximate cause of the injuries and losses suffered by Plaintiff Shante Stephenson, consisting of, but not limited to, *Salmonella* poisoning that colonized her ovaries, a severe infection requiring surgery, diarrhea, dehydration, abdominal pain, cognitive impairment, among other conditions.

80. As a direct and proximate result of said injuries and losses, Plaintiff Shante Stephenson has in the past and will in the future incur medical and hospital expenses for the treatment of her injuries and losses.

81. As a direct and proximate result of said injuries and losses, Plaintiff Shante Stephenson has in the past and will in the future be unable to conceive a child.

82. As a direct and proximate result, Plaintiff Shante Stephenson has in the past and will in the future suffer great physical and mental pain, emotional distress, embarrassment, disfigurement and such other compensatory and economic damages as allowed by law.

83. Defendant's actions of continuing to manufacture and distribute fresh-cut fruit, including the pre-cut melon that sickened Plaintiff, at its Indianapolis facility despite knowing that the facility was susceptible to widespread pathogenic contamination, demonstrated malice in that these actions showed a conscious disregard for the rights and safety of other persons, including the Plaintiff, that had a great probability of causing substantial harm, and did in fact substantially harm Plaintiff and others.

## COUNT II
### Strict Products Liability
### Defective Design or Formulation – Against
### Caito Ohio Rev. Code Ann. § 2307.75

84. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and alleges as follows:

85. When the pre-cut fruit consumed by Plaintiff Shante Stephenson left the control of Defendant Caito, the foreseeable risks of *Salmonella* poisoning associated with its design and/or formulation consisting of but not limited to cutting, sorting, mixing, packaging, and storage exceeded the benefits associated with that design and/or formulation and therefore the pre-cut fruit was defective.

86. As a direct and proximate result of the Caito's defective design or formulation, Plaintiff Shante Stephenson suffered damages as set forth in this Complaint.

## COUNT III
### Strict Products Liability
### Product Defect Due to Inadequate Warning or Instruction
### Ohio Rev. Code Ann. § 2307.76

87. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and alleges as follows:

88. Defendant Caito knew or, in the exercise of reasonable care, should have known of the risks posed by *Salmonella*, and failed to provide adequate warnings concerning these risks that a reasonable manufacturer would have provided.

89. As a direct and proximate result of Caito's failure to adequately warn consumers, Plaintiff Shante Stephenson suffered damages as set forth in this Complaint.

## COUNT IV
### Strict Products Liability
### Product Defect Due Failure to Conform to Representations –
### Caito Ohio Rev. Code Ann. § 2307.77

90. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and alleges as follows:

14

91. Before the pre-cut fruit consumed by Plaintiff Shante Stephenson left the control of Caito, Caito made representations about its pre-cut fruit products, including their safety and quality.

92. The pre-cut fruit consumed by Plaintiff Shante Stephenson did not conform to said representations since it was adulterated with *Salmonella* and was therefore defective.

93. As a direct and proximate result of the pre-cut fruit product's failure to conform to Caito's representations about it, Plaintiff Shante Stephenson suffered damages as set forth in this Complaint.

## COUNT V
### Negligence – Caito

94. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and alleges as follows:

95. Defendant Caito designed, manufactured, supplied, marketed, and sold the pre-cut fruit consumed by Plaintiff Shante Stephenson.

96. Defendant Caito was negligent and careless in and about its design, manufacturing, supplying, marketing, and sale of the adulterated pre-cut fruit that caused the outbreak.

97. Defendant Caito owed a duty to the intended customers of its pre-cut fruit including Plaintiff Shante Stephenson, to ensure that its products were free of dangerous pathogens, including *Salmonella*.

98. Defendant Caito breached this duty by, among others, the following acts and omissions:

   a. Inadequately selecting, screening, and monitoring the suppliers of fruit used in its pre-cut products;

    b.  Inadequately maintaining and monitoring the safety of its products, premises, equipment and employees;

    c.  Failing to properly operate its production and distribution facilities in a safe, clean, and sanitary manner;

    d.  Failing to adopt, implement, and follow adequate food safety policies and procedures;

    e.  Failing to apply its food safety policies and procedures to ensure the safety and sanitary conditions of its food products, premises, and employees;

    f.  Failing to adopt, implement, and validate food safety policies and procedures that met industry standards for the safe and sanitary production of produce;

    g.  Failing to properly train its employees and agents how to prevent the transmission of *Salmonella*;

    h.  Failing to properly supervise its employees and agents to prevent the transmission of *Salmonella*.

    i.  Other acts and omission as are revealed through investigation and discovery.

99.    As a direct and proximate result of the Caito's negligence, Plaintiff Shante Stephenson suffered damages as set forth in this Complaint.

100.    Defendant's reckless decision to continue to producing fresh-cut fruit at the Indianapolis Fresh Cut facility demonstrated malice in that these actions show a conscious disregard for the rights and safety of other persons, including the Plaintiff, that had a great probability of causing substantial harm, and did in fact substantially harm Plaintiff and others.

## COUNT VI
### Negligence *Per Se* – Against Caito
### 21 U.S.C. § 331 and Ohio Rev. Code Ann. §§ 3715.52, 3715.59

101. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and allege as follows:

102. Defendant Caito owed a duty to consumers, including Plaintiff Shante Stephenson, to abide by all applicable laws regarding food safety, and to use supplies and raw materials that complied with all applicable federal, state, and local food laws, ordinances, and regulations.

103. At all times relevant to this action, Defendant Caito had a duty to comply with Ohio Revised Code §§ 3716.52 and 3715.59. Defendant Caito produced and sold a ready-to-eat food product contaminated with a poisonous or deleterious substance, *Salmonella*, and thus was in violation of these and other statutes.

104. Defendant Caito had a duty to comply with federal food laws, including 21 U.S.C. § 331, and all of the rules, regulations, and policies promulgated pursuant to it. Defendant Caito did not comply with these duties because it produced and sold a ready-to-eat pre-cut fresh fruit product contaminated with *Salmonella*.

105. Under Ohio law, the fact that Defendant Caito failed to comply with both federal and state legislative or administrative regulations is evidence that the Defendant breeched its duty of reasonable care and is negligence *per se*.

106. Plaintiff Shante Stephenson was in the class of people intended to be protected by applicable food safety laws. Failure by Defendant Caito to comply with these laws and regulations was a direct and proximate cause of Plaintiff Shante Stephenson's injuries.

107. As a direct and proximate result of Defendant Caito's negligence *per se*, Plaintiff Shante Stephenson suffered damages as set forth in this Complaint.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against the Defendant as follows:

a. For an award of compensatory damages, including damages against Defendant for medical and hospital expenses, pain and suffering, disability and other damages according to proof at trial in excess of Seventy-Five Thousand Dollars ($75,000.00);

b. For an award of punitive or exemplary damages against Defendant in excess of Seventy-Five Thousand Dollars ($75,000.00);

c. For reasonable attorney fees and costs;

d. For pre-judgment interest;

e. That the Court award Plaintiffs the opportunity to amend or modify the provisions of this complaint as necessary or appropriate after additional or further discovery is completed in this matter, and after all appropriate parties have been served; and

f. For such further and other relief this Court deems just and equitable.

Respectfully Submitted,

**RITTGERS & RITTGERS**

*/s/ Wesley M. Nakajima*

_____
Wesley M. Nakajima (0084563)
Gus J. Lazares (0092206)
12 East Warren Street
Lebanon, OH 45036
Tel: 513-932-2115;
Fax: 513-934-2201
matt@rittgers.com
gus@rittgers.com

and

(*PRO HAC VICE* Pending):

Brendan J. Flaherty (0327657)
OFT Law, PLLC
730 2nd Ave S, Suite 810
Minneapolis, MN 55402
Direct: 612-268-0383
Fax: 888-239-0559
brendan@oftlaw.com

Bartholomew B. Torvik (6302166)
OFT Law, PLLC
701 Main Street, Suite 204
Evanston, IL 60202
Telephone: 888-828-7087
Fax: 888-239-0559
bart@oftlaw.com

*Attorneys for Plaintiffs*

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all triable issues.

_____
Wesley M. Nakajima (0084563)